UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC YLMO SANFORD,<br>　　　　Plaintiff,<br>　v.<br>G. GUDINO, et al.,<br>　　　　Defendants. | Case No. 18-cv-01000-HSG (PR)<br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. No. 24 |

## I. INTRODUCTION

Plaintiff, a state prisoner currently incarcerated at High Desert State Prison ("HDSP"), filed this *pro se* civil rights action under 42 U.S.C. § 1983. Plaintiff has filed an amended complaint, which is the operative complaint in this action. Dkt. No. 11. His claim stems from alleged constitutional violations that took place at Salinas Valley State Prison ("SVSP"), where Plaintiff was previously housed, in April 2017. *Id.* at 3-4.[1]

Specifically, Plaintiff alleges an Eighth Amendment claim against the following Defendants at SVSP: Lieutenant J. Stevenson, Sergeant G. Ramey, and Corrections Officer G. Gudino. *Id.* In an Order dated September 13, 2018, the Court found that, liberally construed, the amended complaint stated a cognizable claim for deliberate indifference to Plaintiff's health and safety in violation of the Eighth Amendment against Defendants. Dkt. No. 13 at 3.

The parties are presently before the Court on Defendants' motion for summary judgment. Dkt. No. 24. Plaintiff has filed an opposition, dkt. no. 28, and Defendants have filed a reply, dkt. no. 35. Defendants move for summary judgment on the following grounds: (1) Plaintiff failed to exhaust administrative remedies against Defendants Ramey and Stevenson before initiating this action; (2) Plaintiff's claims should be dismissed because he did not have a serious medical need for a lower bunk assignment on April 13, 2017; (3) Plaintiff's claims should be dismissed because

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

the undisputed facts show that Defendants were not deliberately indifferent; and (4) Defendants are entitled to qualified immunity. Dkt. No. 24 at 18-27.

Having read and considered the papers submitted, the Court GRANTS Defendants' motion for summary judgment.

## II. BACKGROUND[2]

### A. The Parties

At all times relevant to this action, Plaintiff was housed at SVSP. Dkt. No. 11 at 3-4. During the relevant time frame, April 2017, Defendants Stevenson, Ramey, and Gudino were staff members at SVSP. *Id.* at 2. Specifically, Defendant Gudino was the Correctional Officer in facility B assigned to inform Plaintiff about his new cellmate with a lower bunk assignment on April 13, 2017. Gudino Decl. ¶ 2. Defendant Ramey was a Correctional Sergeant and Defendant Gudino's supervisor on April 13, 2017. *Id.* at ¶ 7; Ramey Decl. ¶ 1. Finally, Defendant Stevenson was a Correctional Lieutenant on the B-yard when an alarm was activated on facility B in building 3 on April 13, 2017. Stevenson Decl. ¶ 2.

Plaintiff seeks monetary damages and injunctive relief. Dkt. No. 11 at 3.

### B. Plaintiff's Version

According to the amended complaint, Plaintiff suffers from a seizure disorder for which he had a medical chrono at SVSP requiring him to be assigned to a lower bunk. *Id.* at 3. On April 13, 2017, Defendant Gudino approached Plaintiff's cell, along with another correctional officer, E. Benitez.[3] *Id.* The officers informed Plaintiff that he was being assigned a cellmate. *Id.* Plaintiff

---

[2] This order contains many acronyms and abbreviations. Here, in one place, they are:

| | |
|---|---|
| CCHCS | California Correctional Health Care Services |
| CDCR | California Department of Corrections and Rehabilitation |
| chrono | Comprehensive Accommodation Chrono Form |
| HDSP | High Desert State Prison |
| New Folsom | California State Prison-Sacramento |
| RVR | Rule Violation Report |
| SVSP | Salinas Valley State Prison |
| SOMS | Strategic Offender Management System |
| TLR | Third Level of Review |

[3] Although officer Benitez was named as a defendant in the original complaint, he is no longer listed as a defendant in the amended complaint.

2

told them that he would accept a cellmate but that he was unable to move to the top bunk because of his seizure condition. *Id.* He showed both officers his "lower [bunk] chrono for pre-existing medical condition for seizure," and he told them being on the top bunk would place him at risk of harm. *Id.* The officers looked at the chrono and then left to make a phone call to their supervisory sergeant, Defendant Ramey. *Id.*

After the phone call, Defendant Gudino and Benitez returned to the cell and informed Plaintiff that they had been instructed to pull Plaintiff out of the cell and move Plaintiff's belongings to the top bunk. *Id.* at 4. After Plaintiff refused, Defendant Gudino activated the alarm, reported that they were dealing with a disruptive inmate, and ordered Plaintiff to exit the cell. *Id.* Yard staff responded to the alarm, as did Defendant Ramey. *Id.* Plaintiff complied with the order to exit his cell, after which he was placed in mechanical restraints and moved to the gym holding cell. *Id.*

While he was still in the holding cell, Defendants Ramey and Stevenson approached Plaintiff and informed him they were moving him to a top bunk in a new unit. *Id.* Plaintiff notified them of his "medical chrono (lower [bunk] for seizures)" and told them that being on the top bunk would place him at risk of harm. *Id.* Defendants Ramey and Stevenson stated that they did not care, that this was their yard, and that Plaintiff would go where they told him to go. *Id.* Plaintiff was later forced from the holding cell, escorted to his new unit, and forced into his new cell where he had a top bunk assignment. *Id.*

On April 21, 2017, Plaintiff was climbing into his top bunk when he suffered a seizure. *Id.* He fell from the top bunk and hit the ground, causing injury to his neck, shoulder, arm, and ankle. *Id.*

### C. Defendants' Version

#### 1. Overview of SVSP's Three-Level Approval Process for Bed Assignments and Bed Movements

If an inmate has a housing restriction, such as a medical need to be placed in a lower bunk, the housing restriction will be reflected in a Comprehensive Accommodation Chrono form (California Department of Corrections and Rehabilitation ("CDCR") 7410 or "chrono"). Mojica

3

Decl. ¶ 3; *see e.g.*, Dkt. No. 11-1 at 28. Further, all information about housing restrictions (such as an accommodation chrono for a lower bunk assignment or "lower bunk chrono") is consolidated in a database called Strategic Offender Management System ("SOMS"). Mojica Decl. ¶¶ 2-3. Under the policies and procedures of the CDCR and California Correctional Health Care Services ("CCHCS"), only medical providers have the authority to decide whether inmates should only be assigned to a lower bunk and to issue or change comprehensive accommodation chronos reflecting this information. Feinberg Decl. ¶ 6; Ramey Decl. ¶ 6. Correctional staff—such as Correctional Officers, Sergeants, and Lieutenants—do not have the authority to decide whether inmates should only be assigned to a lower bunk or to issue or change comprehensive accommodation chronos. *Id.*

Under the applicable policies and procedures at SVSP, the process for assigning new arriving inmates to cells and bed assignments for inmates begins as follows: (1) new inmates arrive at SVSP's Receiving & Release department, (2) the Receiving & Release department calls or emails the sergeants of each facility to determine which building has space for the new inmate, and (3) the sergeant on duty will call the officers in each building in his facility to determine whether the building has any empty beds. Ramey Decl. ¶ 3. Occasionally, the Receiving & Release department calls the officers in each building directly to determine whether the building has any available beds or to instruct them that a new inmate is coming to the building. *Id.*

To determine whether the building has any available beds, the officer will first check the arriving inmate's information in SOMS for any housing restrictions. *Id.* ¶ 4. If the new inmate has a lower bunk chrono, the officer will only look for cells that have empty beds on the lower bunk. *Id.* If the officer on duty finds an empty bed in a cell that is already occupied by another inmate, the officer will check the information in SOMS and the inmates' central file to ensure that that inmate who is already in the cell does not have any housing restrictions that conflict with the housing restrictions of the new inmate. *Id.* For example, if the new inmate has a lower bunk chrono, the officer on duty will check to ensure that the inmate who is already in the cell does not also have a lower bunk chrono. *Id.* If the inmate who is already in the cell does not have a lower bunk chrono but is currently assigned to the lower bunk, the officer will request to move the

4

1  inmate who is already in the cell to the top bunk so that the new inmate can be placed in the lower
2  bunk. *Id.*

3   The officer will then notify the sergeant on duty and seek his or her approval for the bed assignment or bed move. *Id.* ¶ 5. The sergeant will then obtain approval for the bed assignment or bed move from the lieutenant on duty. *Id.* The correctional staff will then process the bed assignment or bed move. *Id.* Once the correctional staff has processed the bed assignment or bed move, Central Control will also review the bed assignment or bed move to verify that there are no conflicting housing restrictions between the inmates in the cell. *Id.* Central Control is considered the final authority for bed assignments or bed moves. *Id.* If Central Control determines that the bed assignment or bed move should not be performed due to conflicting house restrictions, Central Control will override the decision about the bed assignment or bed move that was made by correctional staff. *Id.*

### 2. Plaintiff's Chronos for Lower Bunk Assignment

The information in SOMS confirms that Plaintiff did not have a lower bunk chrono on April 13, 2017. Mojica Decl. ¶¶ 4-5, Exs. A, B. The record shows that Plaintiff received a lower bunk chrono a week later, on April 21, 2017, i.e., the day Plaintiff allegedly suffered a seizure and fell off the top bunk. *Id.*; Dkt. No. 11-1 at 28.

Plaintiff claims that he was issued two lower bunk chronos prior to April 13, 2017, but he does not have any copies. Ruhparwar Decl. ¶ 2, Ex. A at 29:18-30:3, 33:6-9, and 33:14-21. Plaintiff does not recall who issued the first chrono. *Id.* ¶ 2, Ex. A at 31:23-25. He does not remember what prison he was housed in when he was issued the first chrono. *Id.* ¶ 2, Ex. A at 31:5-12. He claims he received the first chrono "[d]ue to seizures." *Id.* ¶ 2, Ex. A at 31:14-16. He remembers he received a second chrono from "New Folsom"[4] (where he was incarcerated for "almost three years" before he was transferred to SVSP), but he does not remember in which year he received the second chrono. *Id.* ¶ 2, Ex. A at 29:18-30:9, 38:1-5. He claims that chronos usually have to be renewed, but that when he arrived at New Folsom his chrono was "made

---

[4] "New Folsom" prison is also known as California State Prison-Sacramento.

5

permanent." *Id.* ¶ 2, Ex. A at 30:1-7. Plaintiff claims that he never showed his second chrono, i.e., the one he showed Defendant Gudino on April 13, 2017, to anybody other than Defendant Gudino and Officer Benitez. *Id.* ¶ 2, Ex. A at 38:12-16. Plaintiff does not know of any witnesses, other than Defendant Gudino and Officer Benitez, who could confirm that Plaintiff had a lower bunk chrono on April 13, 2017. *Id.* ¶ 2, Ex. A at 38:17-39:2.

However, in his declaration, Defendant Gudino claims that he never saw the lower bunk chrono that Plaintiff allegedly showed him on April 13, 2017. Gudino Decl. ¶ 5.

### 3. Plaintiff's Medical and Mental Health Records Prior to April 13, 2017

Plaintiff's medical and mental health records from January 1, 2012 through April 13, 2017 confirm that Plaintiff was never seen or treated for a seizure disorder from January 19, 2015 to April 13, 2017. Feinberg Decl. ¶ 7; *see also* Ruhparwar Decl. ¶¶ 3-4, Exs. B-C. Further, Plaintiff's medical and mental health records do not indicate that inmate Plaintiff complained to any primary care provider about having seizures from January 19, 2015 to April 13, 2017. *Id.* Also, Plaintiff's medical and mental health records from January 19, 2015 to April 13, 2017 indicate that the medication Oxcarbazepine was prescribed to inmate Plaintiff by mental health care staff to treat Plaintiff's mental health conditions, and not to treat a seizure condition. *Id.*

### 4. The April 13, 2017 Events

#### a. Decision to Move Plaintiff from the Lower Bunk to the Top Bunk

On April 13, 2017, during the second watch[5] at 10:22 a.m., Officer B. Godinez requested to move Plaintiff from the lower bunk to the top bunk in cell 116 in building 3 in facility B because an arriving inmate needed the lower bunk. Ramey Decl. ¶ 7, Ex. A. The lieutenant on duty during the second watch, Lt. C. Celaya, approved Plaintiff's bed-move to the top bunk earlier that day. *Id.* Plaintiff's move from the lower bunk to the top bunk was "[p]rocessed by [the] Control Room." *Id.* There is no indication in SOMS that Central Control overrode the approval pertaining to Plaintiff's bed-move that was given by Lt. Celaya. *Id.* Plaintiff's assignment from the lower bunk to the top bunk was finalized at 11:27 a.m. that morning. Lopez Decl. ¶ 3, Ex. A.

---

[5] The second watch is from 6:00 a.m. to 2:00 p.m. Ramey Decl. ¶ 7 fn. 2.

6

### b. Plaintiff's Refusal to Move to the Top Bunk
### 1) Defendant Gudino's Involvement on April 13, 2017

Later in the day, the Receiving & Release Department informed Defendant Gudino that a new inmate (inmate Bell, CDCR No. V-84639) was assigned to Plaintiff's cell and that inmate Bell had a lower bunk chrono. Gudino Decl. ¶ 2; Benitez Decl. ¶ 2. Because Plaintiff's bed-move from the lower bunk to the top bunk had already been requested and processed during the second watch (as explained above), the duty of the correctional staff during the third watch[6] was limited to executing the bed-move that was already processed earlier that day. Ramey Decl. ¶ 8.

To prevent any problems, it is Defendant Gudino's and Officer Benitez's routine and practice to check that there are no conflicting housing restrictions between cellmates before they execute the placement of inmates in a new cell. Gudino Decl. ¶ 3; Benitez Decl. ¶ 3. Therefore, on April 13, 2017, Defendant Gudino and Officer Benitez aver that they double checked with the Correctional Counselor in facility B that Plaintiff did not have a lower bunk chrono. *Id.* At that time, based on a decision that was made earlier in the day by other SVSP staff, Plaintiff already had been assigned to the top bunk. *Id.* ¶ 4; Ramey Decl. ¶ 7, Ex. A; Lopez Decl. ¶ 3, Ex. A. The Correctional Counselor confirmed that Plaintiff did not have a lower bunk chrono. Gudino Decl. ¶ 3; Benitez Decl. ¶ 3. If Defendant Gudino had been informed that Plaintiff had a lower bunk chrono, he would have contacted his supervisor to get Plaintiff or inmate Bell transferred to a different cell where both inmates could be placed in the lower bunk. *Id.*

At approximately 3:35 p.m., Officer E. Benitez and Defendant Gudino went to Plaintiff's cell to inform him that he would be receiving a new cell mate. Benitez Decl. ¶ 2; Gudino Decl. ¶ 2. Plaintiff's cell had an upper and a lower bunk. Gudino Decl. ¶ 4. When Defendant Gudino and Officer Benitez arrived at the cell, inmate Plaintiff was occupying the lower bunk. *Id.*; Benitez Decl. ¶ 4. Defendant Gudino explained to Plaintiff that he was going to receive a new cellmate from the Receiving & Release department who had a lower bunk/lower tier chrono. *Id.* Plaintiff stated that they could let inmate Bell in, but that Plaintiff would not move to the top bunk because he had a lower bunk chrono. *Id.*; Benitez Decl. ¶ 5. Defendant Gudino responded that

---

[6] The third watch is from 2:00 p.m. to 10:00 p.m. Ramey Decl. ¶ 8 fn. 3.

Plaintiff was assigned to the top bunk and that he would need to move to the top bunk because his new cell mate, inmate Bell, had a lower bunk/lower tier chrono. *Id.* Plaintiff refused to move to the top bunk. *Id.*; Benitez Decl. ¶ 5.

Defendant Gudino avers that when he and Officer Benitez spoke with Plaintiff on April 13, 2017, Plaintiff did not mention that he had a history of seizures.[7] Gudino Decl. ¶ 5. Defendant Gudino did not know if Plaintiff had a history of seizures when he spoke with him on April 13, 2017. *Id.* Defendant Gudino did not know of any facts that would indicate that placing Plaintiff on a top bunk would place him at risk of serious harm. *Id.* Plaintiff did not show them any documents that indicated that he had a lower bunk chrono when they spoke with him on April 13, 2017.[8] *Id.* Defendant Gudino never took a document from Plaintiff that indicated that he had a lower bunk chrono on that day. *Id.*

Because Plaintiff refused to move to the top bunk, Officer Benitez asked Plaintiff to turn around so he could place handcuffs on him. *Id.* at ¶ 6. Plaintiff refused. *Id.* Either Defendant Gudino or Officer Benitez activated an alarm to get support from staff. *Id.*; Benitez Decl. ¶ 5.

### 2) Defendants Ramey's and Stevenson's Involvement on April 13, 2017

Defendants Ramey and Stevenson both responded to the alarm. Stevenson Decl. ¶ 2. Defendant Ramey does not specifically recall the details of the incident that occurred with Plaintiff on April 13, 2017. Ramey Decl. ¶ 8.[9] But based on Defendant Ramey's routine and practice, if officers call him and inform him that an inmate refuses to move to the top bunk because he has a lower bunk chrono, under the applicable policies and procedures at SVSP, Defendant Ramey will personally double check the information in SOMS and in the inmate's central file to ensure that

---

[7] Plaintiff contests this and claims that he told Defendant Gudino and Officer Benitez that he had a history of seizures. Dkt. No. 11 at 3. The Court accepts Plaintiff's account of this disputed fact as true at this stage.

[8] Plaintiff contests this and claims that he showed Defendant Gudino and Officer Benitez his lower bunk chrono. Dkt. No. 11 at 3.

[9] Defendant Ramey's declaration incorrectly states that the date of the incident was April *17*, 2017. Ramey Decl. ¶ 8. However, the Court assumes this is a typographical error, and that the correct date is April *13*, 2017.

8

the inmate who is supposed to move to the top bunk does not have a lower bunk chrono. *Id.*

When Defendant Stevenson arrived at the scene, he was informed that Plaintiff refused to move to the top bunk due to his lower bunk chrono. Stevenson Decl. ¶ 2. Defendant Stevenson then avers that he logged into a computer to check Plaintiff's information in his central file and in SOMS. *Id.* ¶ 3. Among other information, Defendant Stevenson reviewed Plaintiff's Disability Placement Program Disabilities/Accommodations section in SOMS. *Id.* Plaintiff's central file and the information in SOMS showed that Plaintiff did not have a lower bunk chrono. *Id.* If Defendant Stevenson had seen that Plaintiff had a lower bunk chrono in Plaintiff's central file or SOMS, he would have contacted his Captain to get Plaintiff or his new cellmate transferred to a different cell where both inmates could be placed in a lower bunk. *Id.* Also, Defendant Stevenson did not see any information in Plaintiff's central file or SOMS that indicated that Plaintiff had a history of seizures. *Id.*

Defendant Stevenson spoke with Plaintiff and explained to him that they double checked his files and that his files showed that he did not have a lower bunk chrono. *Id.* ¶ 4. Plaintiff did not show Defendant Stevenson any documents that indicated that he had a lower bunk chrono.[10] *Id.* ¶ 5. Defendant Stevenson did not know of any facts that would indicate that placing Plaintiff on a top bunk would place him at risk of serious harm. *Id.*

## III. DISCUSSION

### A. Injunctive Relief Claims

As mentioned above, Plaintiff seeks both injunctive relief and monetary damages. Dkt. No. 11 at 3.

The jurisdiction of the federal courts depends on the existence of a "case or controversy" under Article III of the Constitution. *Public Utilities Com'n of State of Cal. v. F.E.R.C.*, 100 F.3d 1451, 1458 (9th Cir. 1996). A claim is considered moot if it has lost its character as a present, live controversy, and if no effective relief can be granted: "Where the question sought to be

---

[10] Plaintiff contests this and claims that while he did not actually show Defendant Stevenson the actual lower bunk chrono form, he explained that he had a "medical chrono (lower [bunk] for seizures)" and that placing him on the top bunk would put him at risk. Dkt. No. 11 at 4. The Court accepts Plaintiff's account of this disputed fact as true at this stage.

9

1 adjudicated has been mooted by developments subsequent to filing of the complaint, no justiciable controversy is presented." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Where injunctive relief is involved, questions of mootness are determined in light of the present circumstances. *See Mitchell v. Dupnik*, 75 F.3d 517, 528 (9th Cir. 1996).

When an inmate has been transferred to another prison and there is no reasonable expectation or demonstrated probability that he will again be subjected to the prison conditions from which he seeks injunctive relief, the claim for injunctive relief should be dismissed as moot. *See Dilley v. Gunn*, 64 F.3d 1365, 1368-69 (9th Cir. 1995); *see also Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (same for claims for declaratory relief). A claim that the inmate might be transferred back to the prison where the injury occurred is too speculative to overcome mootness. *Dilley*, 64 F.3d at 1369. The fact that other inmates will continue to be subject to the allegedly improper policies also does not overcome mootness because those inmates can bring their own cases. *Alvarez*, 667 F.3d at 1065.

Here, Plaintiff seeks injunctive relief for his "life long symptoms." Dkt. No. 11 at 3. However, Plaintiff is currently incarcerated at HDSP and no longer housed at SVSP. *See id.* at 1. Because Plaintiff has not been incarcerated at SVSP at least since he left SVSP on June 30, 2017, and he fails to demonstrate a reasonable expectation or probability that he will be housed at SVSP again, his claim for injunctive relief from the conditions of his confinement at SVSP is DISMISSED as moot.

### B. Motion for Summary Judgment

#### 1. Standard of Review

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

1    A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)). The nonmoving party must show more than "the mere existence of a scintilla of evidence." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby,* 477 U.S. at 252). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id.* at 323.

    At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Tolan v. Cotton*, 570 U.S. 650, 656-57 (2014); *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). When, however, "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

    Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). As noted, Plaintiff has filed an opposition

11

to Defendants' motion for summary judgment; however, the opposition is not verified and will not be considered because it was not signed under "penalty of perjury." Dkt. No. 28 at 7. However, Plaintiff filed a verified declaration, which will be considered. Dkt. No. 28-1 at 1, 5. In addition, because the amended complaint is verified, dkt. no. 11 at 3, the Court will construe it as an opposing affidavit under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

In support of the motion for summary judgment, Defendants submit Plaintiff's deposition (Ruhparwar Decl., Ex. A) as well as declarations and supporting exhibits, including copies of Plaintiff's inmate appeals, from the following: Defendants Gudino, Stevenson, and Ramey; SVSP Americans with Disabilities Act Coordinator R. Mojica; Officer Benitez; SVSP Litigation Coordinator G. Lopez; CCHCS Chief Medical Consultant Dr. B. Feinberg; Chief of the Office of Appeals M. Voong; Chief of the Health Care Correspondence and Appeals Branch S. Gates; SVSP Inmate Appeals Coordinator V. Lomeli; and Deputy Attorney General Nasstaran Ruhparwar. Dkt. Nos. 24-3 - 24-13.

Defendants have filed objections to Plaintiff's evidence in support of his opposition. Dkt. No. 35 at 12-13. Defendants assert some of Plaintiff's exhibits are irrelevant to the claims and defenses in this case or are unauthenticated and should be excluded from evidence. *Id.* Although the Court may discuss some of Plaintiff's evidence in question in its analysis, the Court also points out within its analysis why this evidence is not sufficient to defeat summary judgment. The Court concludes that even if any of Plaintiff's evidence is admitted and accepted at face value, Defendants still would be entitled to judgment as a matter of law, as set forth below. Accordingly, Defendants' objections to Plaintiff's evidence are OVERRULED as moot.

**2. Deliberate Indifference to Plaintiff's Healthy and Safety**

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Deliberate indifference to an inmate's health or safety may violate the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d

1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer*, 511 U.S. at 834.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Id.* at 837. The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds*, *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016). Mere negligence, or even gross negligence, is not enough. *Farmer*, 511 U.S. at 835-36 & n.4.

### 3. Qualified Immunity Legal Standard

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

13

To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

With respect to the second prong of the qualified immunity analysis, the Supreme Court has held that "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015) (omission in original) (internal quotation marks omitted). This is an "exacting standard," which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). In conducting this analysis, the Court must determine whether the pre-existing law provided Defendants with "fair notice" that their conduct was unlawful. *Id.* at 1777.

**4. Analysis of Qualified Immunity Defense**

Plaintiff alleges that all named Defendants were deliberately indifferent to his health and safety by ignoring his lower bunk chrono, forcing him to transfer to the top bunk, and failing to prevent him from being injured when he fell from the top bunk after experiencing a seizure on April 13, 2017. Dkt. No. 11 at 3-4.

For purposes of the qualified immunity analysis, the Court finds it unnecessary to assess the constitutionality of Defendants' conduct. Rather, the Court turns to the second prong of the qualified immunity analysis and considers whether, based on the facts known to Defendants at the

14

time of the incident (accepting Plaintiff's version of any disputed facts as true unless "blatantly contradicted by the record," *Scott*, 550 U.S. at 380), any reasonable correctional officer would have been on notice that his or her actions were unlawful under clearly established law.

Defendants argue that they are entitled to qualified immunity because a reasonable officer would not have recognized, under the circumstances, that their actions violated clearly established constitutional rights. Dkt. No. 24 at 26-27.

By 2017, it had long been clear that the Eighth Amendment requires that prison officials take reasonable measures to guarantee the health and safety of prisoners. *See Farmer*, 511 U.S. at 832; *Estelle*, 429 U.S. at 104; *McGuckin*, 974 F.2d at 1059. As mentioned above, the failure of prison officials to protect inmates from dangerous conditions at the prison violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to inmate health or safety. *Farmer*, 511 U.S. at 834. A prison official is deliberately indifferent if he knows of and disregards an excessive risk to inmate health or safety by failing to take reasonable steps to abate it. *Id*. at 837.

The evidence must be viewed in the light most favorable to Plaintiff. *See Tolan*, 570 U.S. at 656-57; *Leslie*, 198 F.3d at 1158. In this case, it is Plaintiff's position that he had a valid lower bunk chrono due to his seizure condition, that he showed Defendants the chrono and told them about his need for a lower bunk, and that Defendants ignored his chrono. *See* Dkt. No. 13 at 2-3. However, Plaintiff admitted in his deposition that he does not have any copies of this chrono. *See* Ruhparwar Decl. ¶ 2, Ex. A at 29:18-30:3, 33:6-9, and 33:14-21. Plaintiff also does not recall who issued the first chrono. *Id.* ¶ 2, Ex. A at 31:23-25. And Plaintiff does not remember in which prison he was housed when he was issued the first chrono. *Id.* ¶ 2, Ex. A at 31:5-12. Plaintiff claims that he handed the "last [chrono] he got before [he] got to [SVSP]" to Defendant Gudino, who "took it from [Plaintiff] and went to the podium and when he came back from the podium he didn't have it in his hand." *Id.* ¶ 2, Ex. A at 33: 14-21.

On the other hand, Defendants have submitted evidence that the information in SOMS confirms that Plaintiff did not have a lower bunk chrono on April 13, 2017. *See* Mojica Decl.

¶¶ 4-5, Exs. A, B. As noted above, under *Scott*, a court need not adopt a nonmoving party's version of the facts if "blatantly contradicted by the record." 550 U.S. at 380–83 (holding that when a video recording of an alleged excessive force incident contradicts the nonmoving party's version of the incident to the extent that "no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *see also Estate of Stern v. Tuscan Retreat, Inc.*, 725 F. App'x 518, 523 (9th Cir. 2018) (affirming district court's grant of summary judgment as to Plaintiffs' claims on the ground that the statutes of limitations had run, and finding that statements in support of tolling argument could not defeat summary judgment because they were "blatantly contradicted by the record") (quoting *Scott*, 550 U.S. at 380).[11] In light of the evidence that contradicts Plaintiff's version, for purposes of ruling on the motion for summary judgment, the Court does not accept as true Plaintiff's claim that he had a valid lower bunk chrono on April 13, 2017, because uncontroverted prison records show that he did not. *See* Mojica Decl. ¶¶ 4-5, Exs. A, B.

Based on the state of the law in April of 2017, the Court cannot conclude that Defendants' actions in moving an inmate who did not have a valid lower bunk chrono to an upper bunk violated clearly established law. The Supreme Court instructs lower courts considering whether the law was clearly established to determine whether "a consensus of cases of persuasive authority [existed] such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2084 (2011). The Court cannot identify, and Plaintiff has not cited, any controlling caselaw existing in April 2017 that provided Defendants with "fair notice" that their conduct as alleged here was unlawful. *See Sheehan*, 135 S. Ct. at 1777.

Accordingly, all Defendants are entitled to qualified immunity with regard to Plaintiff's Eighth Amendment claim, and their motion for summary judgment on this basis is GRANTED.[12]

---

[11] As an unpublished Ninth Circuit decision, *Estate of Stern* is not precedent, but may be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.
[12] Because the Court finds Defendants are entitled to qualified immunity on Plaintiff's Eighth Amendment claim, it need not address their alternative arguments with respect to this claim.

16

## IV. CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Plaintiff's claim for injunctive relief from the conditions of his confinement at SVSP is DISMISSED as moot.

2. Defendants' motion for summary judgment is GRANTED. Dkt. No. 24.

3. The Clerk of the Court shall close the file.

4. This order terminates Docket No. 24.

**IT IS SO ORDERED.**

Dated: 3/6/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge